LESLIE H. SOUTHWICK, Circuit Judge:
Sid-Mar’s Restaurant filed suit in state court demanding compensation from the State of Louisiana for the commandeering of its real property following Hurricane Katrina. While the state court litigation was pending, the United States initiated condemnation proceedings involving part of the same property in the United States District Court for the Eastern District of Louisiana. To avoid potentially conflicting judgments, the United States sought a stay of the state court proceeding. The district court entered a stay, and Sid-Mar’s appealed.
We AFFIRM.
BACKGROUND
From 1967 until destroyed by Hurricane Katrina on August 29, 2005, Sid-Mar’s Restaurant & Lounge in Metairie, Louisiana was owned and operated by the Burgess family. Sid-Mar’s was adjacent to the 17th Street Canal and just outside of the Lake Pontchartrain Hurricane Protection Levee System. After Hurricane Katrina, the Burgesses desired to rebuild in the same location.
In the aftermath of Katrina, the Department of the Army and the Orleans Levee District entered into a Cooperation Agreement. Among other terms, the state agreed to provide the federal government with a right of entry to all lands deemed necessary for various rehabilitation projects. On January 27, 2006, a supplement to the Cooperation Agreement was executed. It provided for the construction of “interim gated closure structures and integrated pumping capacity near the confluence of Lake Pontchartrain with the 17th Street Outfall Canal.” This was followed on February 10, 2006, by then-Govemor Kathleen Blanco’s executive order commandeering the use of specific real proper *272 ty for the project. Among the real property commandeered was the land on which Sid-Mar’s formerly stood. The federal government first entered the commandeered property in March 2006 to begin the construction project. It has occupied the property since this time.
On June 2, 2006, the Burgesses and Sid-Mar’s (collectively referred to as “Sid-Mar’s”) filed a lawsuit in state court against the State of Louisiana seeking just compensation for the taking of its real property. The United States was not named as a defendant.
On June 3, 2009, three years and one day after the state suit was filed and while it was still pending, the United States filed two Complaints in Condemnation in federal district court. One was on a .088 acre tract, the other on a .166 acre tract. Those suits were later consolidated. The entities said to have interests in the property were Sid-Mar’s, the Sheriff as ex-officio Tax Collector for Jefferson Parish, the State of Louisiana, and certain unknown owners. These parcels were among those subject to Sid-Mar’s state court action. The United States simultaneously filed a Declaration of Taking and deposited in the registry of the court the sum it estimated to be just compensation. The declaration and the deposit vested title in the United States to the real property it sought to condemn. See 40 U.S.C. § 3114(b).
Two days after the federal condemnation proceedings began, Sid-Mar’s filed for a partial summary judgment in state court. Sid-Mar’s argued it had acquired title by adverse possession and was the sole owner when the State of Louisiana commandeered the property in 2006. The State responded in part by arguing that Sid-Mar’s title was unclear. A hearing was set for July 21, 2009.
The day before the scheduled hearing, the United States filed a motion in the condemnation suit to stay the state court proceedings. It argued that a stay was necessary to aid and protect the federal court’s jurisdiction. The district court agreed and on July 21 enjoined the defendants from prosecuting the state court suit until authorized by a later order of the federal court. Sid-Mar’s timely filed an interlocutory appeal. See 28 U.S.C. § 1292(a)(1).
DISCUSSION
Sid-Mar’s makes two claims on appeal: the Anti-Injunction Act precluded the issuance of this stay, and even if not prohibited, the issuance of a stay was not proper on the facts of this case. We will consider both arguments.

A. Applicability of Anti-Injunction Act

The Anti-Injunction Act prohibits federal courts from enjoining state court proceedings. 28 U.S.C. § 2283. Congress enacted the prohibition in 1793, in part “to work out lines of demarcation between” the independent court systems of the national government and of each state. Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng’rs, 398 U.S. 281, 286, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970).
There are three statutory exceptions that permit the issuance of an injunction. See 28 U.S.C. § 2283. None of them apply here. The Supreme Court has interpreted the Anti-Injunction Act to allow the United States to obtain a stay even when it cannot meet any of the exceptions. Leiter Minerals, Inc. v. United States, 352 U.S. 220, 225-26, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). The Court held that Congress did not intend the Anti-Injunction Act to apply “when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest.” Id. An *273 injunction is not automatically proper, though, merely because the United States seeks it. We will discuss this point in the last section of our opinion.
The district court issued a stay in reliance on Leiter Minerals. It concluded that the federal suit was the only one that “can finally determine the basic issue in the litigation,” which was the amount and recipients of compensation. The court also noted that the summary judgment motion pending in the state court sought to have Sid-Mar’s found to be the owner of the property. Were that finding made, it would “undermine[ ] this Court’s ability to determine to whom compensation should be paid as part of the federal takings procedure.” Consequently, a stay was proper.
Sid-Mar’s argues that the district court erred by holding that the Leiter Minerals doctrine applies when the United States is the party seeking a stay. Instead, Sid-Mar’s asserts that for Leiter Minerals to apply, there must be a federal interest that predates the state court litigation and requires protection from irreparable injury. The federal interest, Sid-Mar’s argues, did not exist until the United States brought its condemnation suit three years after the state court litigation. We will explain why we place an earlier date on the federal interest. Sid-Mar’s also argues Leiter Minerals does not control because state interests predominate over federal ones; the federal government’s title to property is not at issue in the state suit; there is no risk of inconsistent judgments in the two suits; the state litigation was pending for three years before the federal condemnation action was commenced; and the relevant flood-control project combines local, state, and federal interests.
Sid-Mar’s identifies distinctions that can be made between the facts of the present case and those in Leiter Minerals. We consider Sid-Mar’s arguments regarding the reasons Leiter Minerals should not apply at all as relevant to the question of whether the district court erred in concluding that the circumstances of this case justified the stay.

B. Propriety of Stay in These Circumstances

The Supreme Court in Leiter Minerals acknowledged that even when the United States is the party who has obtained a stay of state court proceedings, it still must be decided whether “an injunction was proper in the circumstances of this case.” Id. at 226, 77 S.Ct. 287. Sid-Mar’s articulates the issue slightly differently. It argues that even if the Anti-Injunction Act does not apply, the court “must also assess whether principles of comity and federalism counsel restraint.” Regions Bank of La. v. Rivet, 224 F.3d 483, 495 (5th Cir.2000) (citations omitted). We have stated that when a district court rules on whether to enjoin state court proceedings, we review that determination for an abuse of discretion. United States v. Billingsley, 615 F.3d 404, 408-09 (5th Cir. 2010). Regardless of the precise articulation of our appellate task, we must answer whether the stay was proper considering the facts of the particular case.
We review the circumstances that justified a stay in Leiter Minerals. In 1949, the United States granted leases on mineral rights it allegedly owned in Louisiana. Leiter Minerals, Inc. v. United States, 224 F.2d 381, 383 (5th Cir.1955), modified and affirmed, Leiter Minerals, 352 U.S. at 230, 77 S.Ct. 287. In 1953, Leiter Minerals brought suit in state court against the mineral lessees, i.e., it did not join the United States as a defendant. Leiter Minerals, 352 U.S. at 221, 77 S.Ct. 287. It sought a declaration that it owned the mineral rights, and the United States had *274 by operation of state law never acquired title. Id. After the state court suit was filed, the United States brought suit in federal district court to quiet title to the mineral rights. Id. at 222-23, 77 S.Ct. 287. The Supreme Court held that only the federal suit could “finally determine the basic issue” of whether title was in the United States because “title to land in possession of the United States under a claim of interest cannot be tried as against the United States by a suit against persons holding under the authority of the United States.” Id. at 226, 77 S.Ct. 287 (citing United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882)). Further, even if the state court sought to avoid as much conflict with the federal court as possible, its judgment could result in confusion because the basic issue of title could not be resolved by the state court. Id. at 226-27, 77 S.Ct. 287. Finally, the United States was seeking to protect the possession of the persons to whom it granted leases by quieting title in federal court. Id. at 227-28, 77 S.Ct. 287. The action was largely defensive, and the court held that the government should be allowed to choose its forum. Id. at 228, 77 S.Ct. 287.
Leiter Minerals also presented an alternative reason there should be no stay. It moved to dismiss the United States’ complaint in federal court “on the ground that the state court had already assumed jurisdiction over the property in question.... ” Id. at 223, 77 S.Ct. 287. Leiter Minerals relied on a case where the Supreme Court would not allow the United States to enjoin an ongoing state court proceeding in federal court because “the state court had obtained jurisdiction over the [property] first and ... the litigation should be resolved in that court.” Id. at 227, 77 S.Ct. 287 (citing United States v. Bank of N.Y. & Trust Co., 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936)). The United States, in Bank of New York, attempted to recover funds over which it claimed ownership that were subject to a state court liquidation. Bank of N.Y. & Trust Co., 296 U.S. at 470, 56 S.Ct. 343. The basis of the government’s claim was that the property at issue in the state suit had been assigned to it before the liquidation occurred. Id. The Court would not enjoin the proceeding because the state court asserted its control over the property first. Id. at 475-76, 56 S.Ct. 343.
The Court in Leiter Minerals was unswayed by this argument, finding the situation different than what was before the Court in Bank of New York. See Leiter Minerals, 352 U.S. at 227, 77 S.Ct. 287. The United States in Bank of New York was acting “like any private claimant” trying to acquire property “it never possessed and that [was] in the hands” of a party appointed by the state court to liquidate an insurance company. Id. at 227-28, 77 S.Ct. 287. In Leiter Minerals, the United States, as mentioned above, was in a defensive posture, “seeking to protect ... possession and quiet title by a federal court proceeding.” Id. at 228, 77 S.Ct. 287. Speaking directly to Leiter Minerals’ argument that the government could not enjoin the state court litigation because the state court had been the first to acquire jurisdiction over the property, the Court wrote that the United States should be able to choose its forum “even though the state litigation has the elements of an action characterized as quasi in rem.” Id. (emphasis added). Leiter Minerals contemplated the government’s ability to enjoin state court litigation when its interest in the subject property went beyond a claim that could be asserted by a private creditor. See id.
This part of the Leiter Minerals reasoning evokes but did not elaborate on a doctrine that is sometimes called the “pri- or-exclusive-jurisdiction rule,” helpfully *275 discussed at some length in a key treatise on federal court practice. See 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3631 (3d ed.2009). The authors write that “when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court[,]” and cite an array of Supreme Court cases for this proposition. Id. (collecting cases). The “prior-exclusive-jurisdiction rule” applies even when the United States is a party. Id. Neither party in the present appeal has discussed this doctrine, though the focus on Leiter Minerals at least tangentially touches on it. We will briefly explore the doctrine.
The Supreme Court, principally in cases that predate Leiter Minerals, frequently referred to the principle “that the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other....” Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939); see also Farmers’ Loan & Trust Co. v. Lake St. Elevated R.R. Co., 177 U.S. 51, 61, 20 S.Ct. 564, 44 L.Ed. 667 (1900); Freeman v. Howe, 65 U.S. 450, 459, 24 How. 450, 16 L.Ed. 749 (1860). The primary reason for this rule is “one of necessity to prevent unseemly conflicts between the federal and state courts and to prevent the impasse which would arise if the federal court were unable to maintain its possession and control of the property, which are indispensable to the exercise of the jurisdiction it has assumed.” Mandeville v. Canterbury, 318 U.S. 47, 49, 63 S.Ct. 472, 87 L.Ed. 605 (1943).
Wright and Miller make no allowance for a situation where, as in Leiter Minerals, the government’s attempted federal lawsuit is largely defensive and attempts to mitigate the possible effect state court litigation might have on the government’s rights, including avoidance of conflict with a later-filed federal lawsuit. See Leiter Minerals, 352 U.S. at 227-28, 77 S.Ct. 287. Leiter Minerals squarely addressed the petitioner’s attempted application of this rule and identified a set of facts that allow a government-filed action to take precedence over this longstanding principle. Id.
In this arena, Leiter Minerals has a limited but powerful impact. Where the United States is a party, and it asserts a claim of right to a piece of property that is subject to ongoing litigation in state court, the government will be able to enjoin that litigation to protect its interests if certain conditions are met. Leiter Minerals identified several factors that could allow the government to take this step: the state court’s inability to make a complete determination of the basic issue in the litigation, confusion that could be caused by inconsistent judgments, and a claim of right or interest in the property that precedes the state court litigation. See id. at 226-28, 77 S.Ct. 287. Therefore, the “prior-exclusive-jurisdiction rule” must be read in light of the principles supporting Leiter Minerals.
In the years following the Leiter Minerals decision, courts of appeals have had few opportunities to apply its holding to cases involving the United States as a party. One case deserves our focus because a sister circuit applied the “prior-exclusive-jurisdiction rule” to deny the United States’ request to enjoin a state court proceeding in which the government claimed an interest in the property subject to litigation. See United States v. Certified Indus., Inc., 361 F.2d 857 .(2d Cir. 1966). In Certified Industries, a sub-contractor filed a mechanic’s lien against a contractor in New York state court to *276 recoup unpaid fees and later attempted to foreclose on the lien. Id. at 859. The United States, seeking unpaid taxes from the same contractor, later filed an action in federal district court, asserting a state-law claim to impose a trust on funds owed to the contractor. Id. The district court granted the government a preliminary injunction which enjoined the state court suit. Id.
The Second Circuit reversed, concluding that the principles of Leiter Minerals were inapplicable. Id. at 860. The subcontractor’s assertion of the lien in state court was not, in the court’s view, “a direct or an indirect challenge to the right of the United States to retain funds or title to property in its possession at the commencement of the state proceeding.” Id. at 861. Therefore, Certified Industries presented facts more closely akin to Bank of New York than Leiter Minerals. See id. at 861-62. The Second Circuit applied the “prior-exclusive-jurisdiction rule” and vacated the injunction. See id.
Certified Industries is part of a line of cases that apply the “prior-exclusive-jurisdiction rule” to factual scenarios where the concerns that prompted Leiter Minerals are not present. The facts in today’s case, however, are more closely aligned with those in Leiter Minerals than either Certified Industries or Bank of New York. In Certified Industries, the court focused on the government’s lack of possession of the property at issue in the state court suit when that suit was filed to find the “prior-exclusive-jurisdiction rule” should preclude enjoining the state proceedings. See id. at 861.
Here, beginning in March 2006, the interest of the United States, as asserted by the State of Louisiana’s commandeering, has been clear. Indeed, it was the government’s delay in pursuing its claims that, according to Sid-Mar’s, led Sid-Mar’s to file its own state court suit. We discuss later the nature of the interest the United States gained. We also will discuss that the precise interest gained either by Louisiana or the United States by the act of commandeering is unclear, but what is beyond question is that Louisiana acted in concert with the United States in taking control of this property prior to the state court litigation. This prior assertion of control distinguishes our circumstances from those in Certified Industries or Bank of New York, where the government had no control over or title in the property involved in the state court suits they attempted to enjoin in federal court. See id.; Bank of N.Y. & Trust Co., 296 U.S. at 470, 475-77, 56 S.Ct. 343.
In our case, the United States claimed the state court litigation could interfere with the federal condemnation because the suits involved some of the same property and there was a risk of inconsistent judgments. The federal condemnation action required the United States to pay the former owner of the property from whom title had been taken by the Declaration of Taking. In the state court suit, Sid-Mar’s sought to have itself determined to be the owner and to receive compensation from the State of Louisiana. The United States argued that Louisiana had not taken the subject property. Because Sid-Mar’s had not joined the federal government as a party, the United States could not remove the suit to federal court. Finally, the United States argued it was entitled to have its rights and interests in the property resolved in federal court.
The parties agree on appeal about one error in the district court’s stay order. In its summary of facts, the district court stated the federal court condemnation suit was filed at the same time as Sid-Mar’s state court suit. In fact, the state court action predates the federal suit by three *277 years. The parties do not agree on the importance of the error. As will be discussed, we find none.
Sid-Mar’s denied there was any risk of inconsistent judgments or any burdens of the rights of the United States. Its explanation starts with describing what occurred prior to the federal condemnation. The property was commandeered on February 10, 2006. The authority for the seizure was the Louisiana Homeland Security and Emergency Assistance and Disaster Act. La.Rev.Stat. § 29:721. According to the governor’s executive order, Louisiana “commandeer[ed] the use” of about ten acres. The commandeering was at the request of the Army Corps of Engineers and was for levee and floodwall construction. The executive order also required that the owners be identified and compensated.
According to Sid-Mar’s, the government was dilatory in identifying and paying owners of the commandeered property. Thus, in June 2006, Sid-Mar’s brought suit against the State of Louisiana. The litigation had not been resolved when in February 2009, a trial date of August 3, 2009 was set. On June 2, the State sought leave to file a third-party demand against the Corps of Engineers. The federal government almost immediately removed the suit to federal court. Within days, the action was remanded, and the Corps was never made a party.
The day after the short-lived removal of the state court suit, the United States filed this condemnation action. Sid-Mar’s argues there was no need to file the condemnation action, as the State of Louisiana and the Corps of Engineers had possession of the property for over three years, a period beginning with the Louisiana governor’s order to commandeer the property. Sid-Mar’s argues it should be allowed to proceed against Louisiana. Only issues of state law will be involved, Sid-Mar’s says, as it does not challenge the federal government’s right to condemn the same property.
Sid-Mar’s agrees that the acquisition of title by the United States and the setting of the compensation it will pay are matters solely for the federal suit. Sid-Mar’s contends, though, that there is no possibility the state court judgment would conflict with the federal judgment. It alleges the state and federal courts will examine who held title to the property during separate time periods, ie., the state proceedings will determine who had title when the commandeering occurred. Sid-Mar’s argues Louisiana must have had title on June 3, 2009, when the United States took the land. As stated in its brief, “the federal condemnation proceedings will determine the compensation the Government owes the State, as the owner of the property at the time of the” Declaration of Taking. In effect, Sid-Mar’s alleges there have been two seizures of title, first by Louisiana from Sid-Mar’s, then by the United States from Louisiana. Sid-Mar’s shapes its argument about title being in the State of Louisiana from 2006 to 2009 into an impenetrable barrier, preventing the state court suit’s decision on title from affecting the federal suit’s decision-making.
Having set up the issues in the two suits in this way, Sid-Mar’s then discusses at some length the case that it argues is most analogous to the present suit See Eden Memorial Park Ass’n v. United States, 300 F.2d 432 (9th Cir.1962). In that case, the United States had agreed to the State of California’s request to condemn part of a cemetery and then to convey it to the state to construct an interstate highway. Id. at 433-34. The request had followed a state appellate court’s holding that the relevant state agency had no authority to condemn a cemetery for a highway. Id. at *278 434. After the federal condemnation was filed, the cemetery owner filed in state court to enjoin the state agencies from taking possession of the property condemned by the United States or to construct a highway across the cemetery. Id. at 435-36. The federal district court entered a stay. Id. at 436.
The Ninth Circuit held that Leiter Minerals gave federal courts authority to issue stays against state court suits whenever the applicant was the United States, but the stay was not proper in the circumstances of that case. Id. at 437-39. The cemetery owner was not contesting the ownership of the United States to the land, and thus the federal court did not need a stay to protect its jurisdiction. Id. at 437. Further, the condemnation suit would fully invest the United States with title to the part of the cemetery property it sought. Id. at 437-38. Whether state law could thereafter block construction across the cemetery would not be an issue for the condemnation action. Id. at 438-39.
In contrast, Leiter Minerals had been enjoined from prosecuting it's action against the mineral lessees in state court because the United States might suffer “irreparable injury.in the form of loss of royalties ... from any temporary, wrongful dispossession of its lessees by the state court proceedings.” Leiter Minerals, 352 U.S. at 223, 77 S.Ct. 287. Because the title of the United States to the minerals could only be finally determined in federal court, there was the potential for conflicting judgments if the state court proceedings were not stayed. Id. at 228, 77 S.Ct. 287.
Sid-Mar’s argues there is no potential for conflicting judgments here, just as there was not in Eden and unlike Leiter Minerals. In Sid-Mar’s view, no conflict will arise because the federal court may decide title (in the State of Louisiana) and the compensation amount (presently unknown) without needing to know the result of the state court suit.
The argument, able as it is, requires our accepting the premise that in 2009, title was in the State of Louisiana. The premise may, however, be false. The United States concedes that it is uncertain what estate is seized by the act of commandeering. Determining what property interest Louisiana acquires by commandeering begins with the relevant statute. Pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act (the “Act”), the governor has the authority to “commandeer or utilize any private property” found necessary to cope with a disaster or emergency subject to applicable compensation requirements. La.Rev. Stat. § 29:724 D(4). The Sid-Mar’s property was commandeered in order to provide the United States with “right of entry to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas” as needed for the repairs to the 17th Street Canal. The Executive Order specifically reserved to the private owners “all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired” by the commandeering.
In addition, the Cooperation Agreement between the United States arid the State of Louisiana contemplated that the State would commandeer property such as that involved in this suit. It then provided that the United States would “obtain a deed or servitude agreement, as appropriate,” to the property. If necessary, the United States would acquire property in its name through eminent domain. These terms support the proposition that the act of commandeering displaced Sid-Mar’s right to use the property, but it was understood that the United States would thereafter *279 acquire the interests it needed through negotiation or by eminent domain.
It is unresolved whether the premise of Louisiana’s ownership from 2006 to 2009 is correct. If Sid-Mar’s or other owners still had title because title was among “such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired” by the commandeering, then the condemnation is necessary to establish that title and the compensation due. There remains a serious issue of who is to receive the compensation in the federal condemnation suit. To the United States, that uncertainty makes Leiter Minerals factually similar. There could be conflicting just-compensation awards that are based on different interpretations of the interests acquired by the act of commandeering. In addition, if title were not acquired by Louisiana through commandeering this property, another question will be how compensation for the loss of use prior to condemnation is to be calculated and who is to pay it. We do not need to decide the state law issues. Resolving them in the most appropriate manner that still protects the jurisdiction of the district court for the condemnation action is a matter to be considered on remand.
The district court was correct about the potential conflict between state and federal judgments concerning who held title to the property at the time of the June 3, 2009 taking by the United States, and how the amount of compensation due. Without deciding the issue of ownership, it is possible the United States had a claim to the land that preceded the commencement of the state court lawsuit. Since March 2006, the federal government has been in continuous possession of the land. Further, the Executive Order that acted to commandeer the property referred specifically to the Cooperation Agreement between the United States and the Orleans Levee District in the section that set out compensation for the previous owner of the property. That Cooperation Agreement, as mentioned above, indicated the federal government would later acquire full ownership rights in the property.
One circuit court, applying Leiter Minerals, has allowed the government to enjoin state court litigation involving a piece of property because the government held a future interest in that property. See Alonzo v. United States, 249 F.2d 189, 196-97 (10th Cir.1957). At the very least, the uncertainty surrounding the ownership of this property and the extent of the United States’ interest militates in favor of enjoining the state court litigation.
Sid-Mar’s also argues that Leiter Minerals was incorrectly decided. We understand the argument may be offered in order to preserve it for possible review by the Supreme Court. Surely all also understand that this court does not have the authority to overturn a Supreme Court ruling.
Central to the final resolution of the condemnation issues is whether the State of Louisiana acquired title by the act of commandeering. The Supreme Court in Leiter Minerals also faced a foundational issue of state law. After holding that a stay was permissible, it also suggested the need for the federal court to receive the opinion of the state court on the state law issues.
Before attempting to answer [the state law questions] and to decide their relation to the issues in the case, we think it advisable to have an interpretation, if possible, of the state statute by the only court that can interpret the statute with finality, the Louisiana Supreme Court. The Louisiana declaratory judgment procedure appears available to secure such an interpretation, and the United *280 States of course may appear to urge its interpretation of the statute. It need hardly be added that the state courts in such a proceeding can decide definitively only questions of state law that are not subject to overriding federal law.
We therefore modify the judgment of the Court of Appeals to permit an interpretation of the state statute to be sought with every expedition in the state court in conformity with this opinion.
Leiter Minerals, 352 U.S. at 229-30, 77 S.Ct. 287 (citations omitted).
The Louisiana Supreme Court subsequently ruled on the declaratory judgment. Leiter Minerals v. California Co., 241 La. 915, 132 So.2d 845, 849-50 (1961).
The district court will need to determine the best manner in which to proceed in reaching an answer to the title questions that arise because of the commandeering. It might resolve the question itself, lift the stay for the limited purpose of allowing the state court to determine title, or take other steps to avoid the potential for inconsistent rulings in the two proceedings.
AFFIRMED.